of the calendar, and proceed right away with 22-2232, New York Times v. DOJ. And counsel for appellant. You've reserved two minutes for rebuttal. Yes. Whenever you're ready. Thank you, Your Honor. And may it please the Court, my name is Alamin Sumar, and with my and Jack Ewing. Seven years after Volkswagen was charged with crimes for the massive fraud it perpetrated against the people of the United States, the American public may be well acquainted with the facts of the fraud. But it remains largely in the dark about whether the company has solved the root causes of the fraud, and relatedly whether DOJ did the right thing in ending the company's monitorship. One of the documents that would shed light on these questions is the initial report produced by the independent monitor himself, who oversaw VW's compliance with the plea agreement. Yet the version of that report produced in this litigation is so redacted that the public knows nothing of substance about what the background matters, not his factual findings, and none of his recommendations and observations. The district court. On recommendations and observations, I gather you concede that those are covered by the deliberative process. Correct. Under exemption 5, right? Correct. And so the arguments as to those are purely based on foreseeable harm. And we would say, Your Honor, if you look at the declarations submitted by DOJ and VW in this case, that they assert that there would be some harm from release of that material. But what they don't spell out is why. And I think that's very hard to square this idea that there is going to be some chilling effect on future monitors with the history of independent monitorships. I mean, DOJs use independent monitors in all sorts of contexts. And in many, the reports are made public. You do concede that the independent monitor here is serving a role analogous, maybe exactly the same as DOJ personnel. For purposes of the consultant corollary exception, I mean. Yes. Correct. But we would say when you're doing the foreseeable harm analysis, Your Honor, you have to look at the context. And you have to look at who the person is that's authoring the deliberative material and, you know, their relationship. And I would say again. Well, you seem to be walking back from what I understood to be a willingness not to dispute that the monitor here is in a comparable role to DOJ personnel. Now you're saying it's a matter of context. The context is this context, whatever that is. I'm saying for purposes of the foreseeable harm analysis, for the question of whether Exemption 5 applies, we're not disputing that. But for the question of foreseeable harm, I think, you know, the Thompson who have served in this role in the past. And in some of those cases, including cases that the DOJ has taken on, these reports are made public. Do you know if there was a promise of, get a little bit circular, but was there a promise of confidentiality in the establishment of the monitorship as there is here? So on the theory that it's that promise which incentivizes truthful information and that aids the agency decision-making process, I wonder if the examples that you're referring to had that comparable dynamic. You know, they did not. I guess they did not. I don't know all of them. But, you know, in cases where in civil rights context and certain corporate contexts where the court is supervising that person, I think there's an expectation that it's going to be public. But I think the point I'm getting at is that nobody thinks in those situations that the fact of transparency or the fact that the recommendation is not true. Your brief argues that monitors anticipate these requests, and so there would be no chilling effect? You make that argument. The point is that transparency here is a good thing. And that in other contexts, we have not seen transparency. Yeah. I think it's Volkswagen. One of the defendants argues that no monitors report has ever been ordered to be disclosed under Exemption 5. And is that true? Do you agree with that? Are you aware of any other circumstances? Not in full. But to my knowledge, this is the only case involving a monitors report that postdates the 2016 amendment. And so I think this court just has to apply a different legal standard that the courts in those cases have not. And the standard as this court spelled out two years ago in a case involving Exemption 4 is has the agency spelled out foreseeable harm to an interest protected by the privilege? And I think even if you could say What's the protected interest here for Exemption 5? That's candor within the agency. And why isn't there a risk that there would be reduced candor if there is a concern about these things being disclosed? Well, let me say two things about that. Isn't it foreseeable that there may be a chilling effect? Let me say two things about that. The first is I don't see that as credible. And I don't see any evidence in the record going to portions of the report other than recommendations and observations. If you look at the evidence submitted in this case, the declarations of the DOJ, the declaration submitted by the employee of VW, they talk about the need for candor or the need for confidentiality in opinions and recommendations. And that's a very, that's, you know, one portion of what's been redacted. Of course, there's much more, a lot of factual information. And so we think under the law that that has to be viewed differently than the rest of the report. But even as to the recommendations and observations, I would say there is no adequate explanation of why there would be a chilling effect. And again, I think if you look at the history of independent monitorships in this country, you know, those who have been, where reports have been made public, I mean, they have not felt reticent to make criticisms and recommendations and observations as they saw fit. Can I ask you, I'm going to go back to my original sort of structure of the argument question. Because there's this question, there's this issue of whether there's purely factual information or whether it's inextricably intertwined or a culling of information that would disclose some of the monitors analysis or judgment and the like. It seems to me the way to think about that is whether it you're going sort of line by line and thinking or section by section, is this paragraph purely factual information or is it intertwined? That that's a question about whether it fits within the exemption. And you've conceded it fits within the exemption. As opposed to the FIA question of whether sort of writ large, this kind of information that's included has a foreseeable harm to the underlying interest. Am I structurally thinking about the argument the wrong way? I think insofar as you're saying that the foreseeable harm analysis is just focused on the document broadly, I would push back against that. So you do foreseeable harm line by line? I would say line by line. But I do think that if you're looking at the report and you're looking at the recommendations and observations, those may stand on different footing than something like Appendix D. And I really want to emphasize that portion of the report, which is 11 pages, set off from the rest of the report, set off from recommendations and observations, and purports to describe what the company has done with respect to hiring and promotion following the diesel matter. This is 784 to 794 in the record. And I would say you don't have to go line by line, but I do think that in assessing this question of what's harmed to the interest protected by the deliberative process privilege, you have to look at that very differently than the recommendations and observations. But let's say, I think, as a general matter, the free flow of information between the monitored third party and the monitor will ultimately aid agency decision-making process. Just as a general matter, that seems sort of logically true. You're talking about people at the company and the monitor? I'm sorry? Yeah, I'm talking about the flow of information from the third party monitored entity, Volkswagen, to the monitor, the agency here, will ultimately enhance the agency decision-making, namely the monitor's recommendations to DOJ. I would say two things about that. One is I don't think that has actually been established. As we've said in our briefs, there is an obligation on the part of the company to provide the monitor with whatever he needs on penalty of potential criminal prosecution. And so the idea that they would be less forthcoming when that is hanging over them, that's not logical or plausible. And we also have an exemption for personal privacy, which we have accepted applies to the monitor's report to protect the identities of low-level employees who are providing information. But the legal point is that that's just not relevant to the deliberative process privilege. And if you look at the decisions of this court and, indeed, the Supreme Court, they talk about the need for candor within the agency, among decision-makers. And if the privilege is really about the free flow of information... Well, but you're not talking about FIA cases, right? No, I'm talking about... So I understood that the question for the FIA case is whether the disclosure would foreseeably harm an interest that motivates the exemption. So if that's right, then isn't quality agency decision-making an interest that motivates the exemption? Right. And what I'm saying is... And so if disincentivizing... And I take your point that factually it hasn't been established. But if we accept for a moment that the free flow of information ultimately enhances agency decision-making, then isn't it the case that the foreseeable harm requirement would be met? No, no. And I realize the cases I was referring to are not FIA cases, but they're cases that talk about the reasons why we have a deliberative process privilege. Right? And if the deliberative process privilege was broadly... Ultimately, it's about better agency decision-making and better policy. But if the deliberative process privilege was really about getting better information from the outside, the privilege would apply to those communications. But it doesn't. It's very restrictive. It applies to communications within the agency and consultants. And when you have external communications, the privilege has no application. So the idea that that could be relevant to foreseeable harm and to the interest protected by the privilege just doesn't make sense. And what about the asserted interest of incentivizing or disincentivizing negotiated resolution to criminal charges? How do you see that? I just don't think that's... I don't think that's legally relevant. I mean, I do think that it's speculative and it hasn't been established. But that sounds to me like a policy argument, that DOJ needs the latitude to be able to persuade these companies that this is in their interest. Well, Congress can do that for them. I mean, Congress has legislated exemptions, certain statutory provisions like that in the past. So we see that as a policy argument, not relevant. It's really purely about candor within the agency. And again, I think, you know, looking at the report, it doesn't have to be line by line, but we urge the court to look very differently at, you know, what are factual portions, the appendix, and the recommendations and observations in that analysis. Can I ask you one more? And I'll extend your time. You'll have your rebuttal time. On that careful look question, one thing that's occurred to me, and I haven't found a great amount of guidance for it, is that, and again, on the factual intertwinedness, the idea of culling and the like, do you have a view as to whether that, should that involvement be apparent on its face? In other words, if I see a factual recitation, I don't know, looking at it necessarily, whether there's been culling or not, just as an example. Does the agency have to explain that there's been culling and show that there's been culling in order for it to meet the factually intertwined requirement? Yeah, I think they have to explain that there's been culling, but more than that, they have to explain why disclosing that material would reveal the deliberative process. I mean, as we said in our briefs, any time you're making a factual summary that's going to go in a deliberative document or document that has deliberative material, you're going to be including some facts and excluding some others. And what the law says is that's not enough to make it deliberative, that there has to be something more. Maybe it's that it's really bound up with the deliberative matter, or maybe it's that there is a public record from which the summary is drawn that somebody could look to and say, oh, you know, the summary shows not just what the decision maker thought was significant, but also what they didn't think was significant, what they left out. And that's much more probing of the agency's deliberative process. So I do think that, you know, to the extent the district court said, the fact that it's culled from this broader universe of information makes it deliberative is just not correct. Why don't you take 30 seconds to speak to Exemption 4, if you'd like. Sure. You know, I think insofar as DOJ and VW seek to shield the same information under Exemption 4, they can't do so. And really, you know, the court does not have to get into the question of whether the information is commercial or not to wade into an area that this court, you know, the courts of this circuit have a very different view than the agency and VW for the simple reason that the showing under the foreseeable harm standard hasn't been met. And again, all you need to look to here, and this is what they refer to repeatedly in their briefs, is JA-166, the declaration of the VW employee, where he has two vague sentences about the harm that would befall the company from disclosure of information about its compliance and risk management system. Like, that's just not enough. So to the extent the court reaches the question of Exemption 4, that's enough to dispose of it, and it doesn't need to reach the question of, you know, what constitutes commercial information or not. Though if it does, I won't get into that now, we think that it should take a very narrow view of that term. All right. Thank you, Mr. Samar. We'll hear from counsel for the United States. Mr. Sun. Good morning, Your Honors. And may it please the Court, Anthony Sun from the U.S. Attorney's Office for the Southern District of New York on behalf of the government. Your Honors, this Court should affirm the judgment because the material at issue was properly withheld pursuant to the deliberative process privilege, and DOJ reasonably foresaw harm to government decision-making from its release. And though the Court need not reach the second question on Exemption 4, if it does, much of the remaining material is commercial and also properly withheld. So with respect to the deliberative process privilege, there's two key issues. The first is whether the Court was to release factual material that was inextricably intertwined with the monitor's privileges and recommendations, and whether DOJ in its declarations, justifications, logically and plausibly established reasonably foreseeable harm to government decision-making both in this particular monitorship of VW and similar deliberations in the future. And the factual material at issue in this case all supports the monitor's policy-based recommendations as intertwined with the protected observations and recommendations. The factual universe involved over 4,200 documents reviewed by the monitor and his team, over 420 meetings distilled into a densely packed report. Now, taking the lead from this Court's opinion in Lead Industries, which is instructive, one doesn't merely pluck purely factual tidbits. Instead, the Court must consider facts in the context of the document and the administrative process. And in this case, far from a broad withholding, though we recognize a lot has been redacted, but there was a line-by-line review conducted in camera by the District Court, and it upheld the withholding only of material that reflected the monitor's assessment of the information that supported his observations and recommendations and that were relevant to DOJ's decision-making, namely, whether Volkswagen was compliant with the agreement, whether the monitorship should be terminated or extended, and the monitor's own performance in that context. And so detailed was this line-by-line review that, in some cases, the District Court actually released parts of sentences, individual clauses. And examples are at Joint Appendix 634, Joint Appendix 656 through 658. This is not a painting with a broad brush, but truly— What do we do on appeal? I mean, do we do our own independent line-by-line review and look over whether parts of a sentence that were plucked out were properly plucked out? Your Honor, the Court need not do that. The Court always has the option. Our view is that the declaration submitted by the government and by the monitor's team and by Volkswagen in this case fully established the deliberative nature of— Well, no, I understand that, but that goes more to whether the exemption applies and to the foreseeability issue. But in terms of the factual intertwinedness, what happens on appeal? Is it still de novo review, and what does that mean in this context? It is de novo review, Your Honor, and I think the approach is as follows. What the Times has put forth is essentially speculation that these are purely factual statements that were withheld. And the record put before the District Court— I mean, they don't know what they are, so it's hard to do much more than speculate based on the evidence that they have. Certainly in any FOIA case, the requester is at a disadvantage that they don't see the underlying document. So they've drawn, for example, from the table of contents, which I gather the District Court decided should be disclosed. Correct. And so that provides some information as to what the broader topics of certain areas includes. Correct, Your Honor, and to be fair, the District Court just released certain parts of the table of contents that were redacted. It wasn't that the whole table of contents was initially redacted. If one looks at the report, even in its redacted form, we submit that it's self-evident that the way it's structured is it has the monitor's observations, the monitor's recommendations, followed by a discussion of how those observations and recommendations were reached. But let's assume that, and I'll move away from the specifics, just make it hypothetical, but it's organized like that, but the first section is a chronology of factual information. How is that analyzed? That's all we know. It's a chronology of relevant information, a chronology of background. How do we know, looking at that, whether that's intertwined or not? Well, Your Honor— Because there's a D.C. Circuit case that exempts a chronology, for example. I forget the name, but the U.N. war crime case. Your Honor, as in any other FOIA case, the government is required to submit its affidavits or its declarations in support, and these were detailed declarations, two declarations by the Department of Justice that explained the nature of the material that was redacted, the basis for those redactions, what they fed into the monitor in the monitorship, the specific factors—excuse me, the specific reasons why disclosure would be harmful. The monitor's team submitted their own declaration, which explained why these redactions were necessary to enable the monitor to write the report with sufficient detail in a matter that would be helpful to DOJ. And I think in the ordinary context, the government's declarations are entitled to a presumption of good faith, and there's been nothing shown here on the record, both without in-camera view and certainly following in-camera view, that the government's declarations were anything but to be credited and that the redactions were appropriate. We don't have the unredacted version in the record, correct? It is available to the court, and we certainly will furnish an additional copy. It's not in the papers that were provided. So I'm not sure how—I mean, just following up on a question asked earlier, I'm not sure how we can do the kind of de novo review that the law would seem to require. It's in the district court record. It is in the district court record, so it's available to this court, but again, we will separately furnish it if the court desires. Certainly, okay. It's now apparently digitally available. I looked at it, so it was available in some way. It's not—you didn't provide a sealed appendix that included it, but it's available. I can say that I looked at it. I did not realize it was now digitally available. That's more than I can say. But to turn to the foreseeable harm portion, Your Honors, as the court has recognized, the deliberative process privilege is designed to protect agencies from being forced to operate in a fishbowl and encourages candor within the agency, which is— Will monitors really be less frank if they have to worry about FOIA disclosures? Well, Your Honor, we don't need to speculate. The monitor's team in this case, Joint Appendix 141— Subjectively. I mean, would a monitor hold back information? I mean, that's what I'm asking. Is that a likely scenario? Well, certainly it is the view of this monitor. It is the view of the Department of Justice. It is logical and plausible and rational that to ensure proper— Why would a monitor be less frank? Your Honor, I can't speak to every monitor, but it's similar to, again, this monitor takes on the role of any government employee under the consultant corollary and similarly how government employees could have less candor and be reluctant to express their true thoughts and opinions in the deliberative process if those opinions, frank opinions, would be released later to the public. A monitor is under similar—I don't know if this is the appropriate word—pressures or considerations that future release of what could be controversial opinions could be chilled if those are not made in a manner and protected in a manner that allows those to be aired freely. Is there any Department of Justice policy, written or unwritten, dealing with whether a monitor can issue a promise of confidentiality in this kind of investigation? Your Honor, I do not know the answer as to whether it's a general policy, but for this particular case— There was one here. Well, there was specifically in the plea agreement provisions. What I can't say is whether there's an overarching department-wide policy, but certainly this plea agreement may express promises of confidentiality in furtherance of the monitorship and its goals, and the DOJ stands by those. So it would seem that there's little point in deciding, generally speaking, whether confidentiality would increase or decrease the effectiveness of compliance with the Act. We have a requirement here, and the monitor was acting, as was the Department of Justice, under an order, essentially, that granted confidentiality. Correct. The plea agreement requires it, and the government is abiding by it. What does that tell us about the FOIA analysis? Your Honor, I think it goes both to the fact that these were subject to the deliberative process privilege, but more importantly, it goes to the harm. It was recognized ex-ante during the plea agreement stage that the monitorship would need to operate under these assurances of confidentiality precisely because the lack of confidentiality would compromise the mission and the purpose of the monitorship. And so it wasn't that there was a monitorship and later on they decided, oh, there's some sensitive stuff in here that maybe could be problematic. It was the other way around. We are going to be discussing sensitive things. We are going to be investigating this in detail so that the Department of Justice can determine whether to prosecute, whether to extend the monitorship, whether not to extend the monitorship, and therefore we need to encourage full candor amongst the parties to ensure that the decision is as sound as possible. All right. Do you want to briefly address Exemption 4? Certainly, Your Honor. The vast majority of the material that was withheld under Exemption 5 is also withheld under Exemption 4. Though the district court rejected that assertion, it is still a potential avenue to support the vast majority of the withholdings. In this case, the district court, in our view, did not correctly interpret commercial. It interpreted it far too narrowly, and if the court reaches the B4 issue, it should remand for evaluation under the current standard. We understand, based on the arguments presented today, that the Times is largely focused on the foreseeable harm aspect, which was not addressed by the district court. But in this case, again, the record reflects that release would provide the competitors of Volkswagen with proprietary information about how the company operates, including its business model, how it structures its operations, its systems, its technical and product development, and its compliance process. So that's a pretty high level of generality. Don't, under SIFE, we require specific information that sort of would answer the and why question that I think naturally occurs after hearing that broad statement. Sure. And to be fair, Your Honor, this is a multi-hundred-page report. There's a high-level description of it. But as the opinion in this court's opinion in SIFE said, quote, small incremental value to competitors is harm. End quote. A benefit to competitors would necessarily be a detriment causing harm to a submitter. The car industry, the automotive industry, just like the pharmaceutical industry, which was an issue in SIFE, is a highly competitive industry with a long product development process. And the information here is the commercial or financial interests of the submitter, in this case Volkswagen, that is of a type held in confidence and not disclosed to any member of the public. It seems to me that's what the declaration says. The declaration says we keep this information confidential. Therefore, it would harm our commercial interests. That doesn't seem like it's sufficient to me because that's just a repetition of what we had prior to the FIA. So, Your Honor, let me give you a very concrete example. So after the district court's decision came down and after the time's opening brief, the government and Volkswagen re-evaluated the one remaining B-4 exemption, one sentence. And in evaluating that, it was determined that it no longer needed to be protected. What was that sentence? That sentence was that the VW management board chair, Matthias Muller, has set a goal for the company's sales to be comprised of 25% electric vehicles by 2025 and 50% by 2030. These are concrete sales targets and business strategy that were only released after this case had already been litigated and after the district court's decision, VW had decided to voluntarily disclose that business strategy. That's just one example of the types of concrete business strategies that, quite frankly, have incremental value to competitors and would harm a submitter such as Volkswagen. And if we go back to the animated... I'm sorry, that was released? That was agreed to be released? After the fact, because Volkswagen had made public statements after this case had started that ultimately meant that it was no longer... So the same information had been conveyed publicly. Right, but it was held in confidence prior to that. And that goes, again, to the animating purpose of Exemption 4. That just seems fundamentally different than a lot of the redacted information. Well, Your Honor, that's not true because, again, the redacted information goes to the very methods by which Volkswagen goes about its business, including its product development processes, for example. And so B4 is designed such that one cannot get information from the government that a company had submitted that it couldn't ordinarily get from the company itself. In this case, these are the confidential strategies and business processes and business organization that Volkswagen would not give to its competitors or the public. It's a general matter that... But even as you just articulated, it just sounds like you're saying if the company keeps a confidential, therefore it's commercial. You said if you can't get it from the company itself. Is that the right way to think about it? Your Honor, at a very broad level, yes. But, of course, the devil would be in any particular fact. It is conceivable that there are certain facts that are held in confidence that would not be material. And perhaps that's the best way to answer Your Honor's question, The standard requires... Let me make sure I get the right language. I apologize. I can't find it. Oh, here we go. Where disclosure would materially affect the commercial fortunes of the submitter. So it's not to say that any particular thing that's held in confidence would be withholdable. But those things that would materially affect the commercial fortunes, would materially affect its ability to compete, would be an incremental benefit to a submitter's competitors. So while on its face, yes, anything that's held in confidence is broad, it is tempered by the fact that it has to have this material impact. And so if the declaration that's being provided to meet the specific requirement of the FIA is simply a version of we keep it in confidence, therefore it affects our commercial interests, is that sufficient? Your Honor, I don't know what I can say generally. I can say in this particular case, the information, it's somewhat self-evident that there's foreseeable harm. Again, the very business strategies and the very operations of the company, this is not... I mean, just to draw on that, Your Honor, you mean information that would show compliance or noncompliance with a criminal plea agreement is going to impact the company's bottom line? I mean, I feel like there's a little bit unstated here that I want to make sure I understand what the theory is. Is that the idea? It's not merely that it's in the context of the criminal resolution. This monitorship put the company under a microscope, and so the monitor was looking at all aspects of the company's processes to figure out why the fraud at issue happened and whether they were making the appropriate changes to recommend to DOJ whether certain changes should be made or not to ensure compliance. And so it's not merely that it was part of the criminal process. Okay. All right. Thank you, Mr. Senn. We'll hear from Ms. Ratner for Volkswagen. Thank you, Your Honor. May it please the Court, Morgan Ratner for Intervenor Volkswagen. I want to address two Exemption 5 points quickly, and then I'll turn in my short time to Exemption 4. I think on foreseeable harm, the most important point here is that really the Times' only argument is plausibility or credibility, and the question is, is it plausible or credible that this monitor, if he had known that his communications would not be confidential, might offer something less to the government? And this Court has already said yes. In the inner-city press case, it has said the difference is not a difference between full candor and lying to the government. Of course we're not asserting that. The difference is full candor and doing the bare minimum required, or as the Court also put it, having more restrained disclosures. It's the difference between a 156-page monitor report and a 90-page report. And as long as that's plausible, and I think it has to be, then the government has met its burden with its declarations here. On the factual segregation point, I do think, Judge Nathan, you were asking about what you have in the declarations. I think pages 290 and 302, the Department of Justice explains how the facts are used in the report here. And I think that's, as the government has said, self-evident. So that was the briefing? Those are the declarations from the government that talk about how the facts are used. I think it's also self-evident from the report, as the government said. The report kicks off by saying, at page 603, that in the body, the key facts that are listed are used to support the recommendations and observations. So I think the analogy to the Waterman case that Your Honor referenced is we do have some material at the start of the report that was released, and that's more like the comprehensive chronology that was released in Waterman. And then there was a separate part in Waterman where the government employee listed all of the facts that he thought supported a misconduct determination. And that's exactly analogous to what we have in the body of the report here. We have recommendations and observations paired with the facts that support them. The government declarations explain that setup, and I think that while the court can look in camera, it doesn't ordinarily feel the need to do that for upholding a reasonable segregability determination. So does it have to be readily ascertainable on the face of the redacted document? I think usually if the declarations are themselves sufficient to understand how the facts are incorporated, that is usually what courts will look to. Because, again, in the typical case, you're not reviewing in camera, and you might have an entire document excluded. So the only way to do that analysis is looking at how the government describes the facts. Here, we do have the report, even the redacted report, that we think bolsters what the government declarations say. But you certainly don't need that on the report itself because in the mine run FOIA case, you would not have it. You would not be looking at anything in camera. On Exception 4, to start with the foreseeable harm, I think there's more than just a statement that this is confidential. And pages 166 and 42 are where the harms are described most clearly. And it's twofold. From our side, from Volkswagen's perspective, we described, we keep these things confidential, and they relate to product development and to compliance systems. It is true that there's not a further sentence that says, and the products we develop and our compliance systems are things our competitors might like. But I think that that's pretty fairly implicit, and courts have said that for the foreseeable harm analysis, you can use- Could you explain how your compliance system, which the public might have a real interest in, why it is commercially protected? Sure. I think the key thing is that compliance is part and parcel of what we do, just as much as analysis of what's technologically feasible or economically valuable. And so a good example of this is part of, we know from the report, some of this compliance system covers our product development. It has 109 golden rules for product development and software system. So when Volkswagen is developing a product, it has to not just decide, okay, we can do this as a technological matter, we can do this, this would make good sense financially, but also, are we ticking off those many boxes on the compliance side? And so that constrains what products we can make. That's unredacted, isn't it, the golden rule section? What is unredacted is that there are 109 of them. We would very much like to keep further detail of what they are redacted. And so that's the difference, the existence of them is unredacted. Under that reasoning, everything would be covered. Everything would be commercial, it seems. I don't think so, Your Honor. I think most things related to compliance programs probably would, but compliance programs we do think are pretty close to the core. Can we be a little specific about compliance? It struck me that there are compliance programs, sort of compliance with the law generally, and then there's compliance with the plea agreement. So tell me how, because I think a lot of this pertains, at least potentially pertains, and I understood the monitor's task to be assessing compliance with the plea agreement. Is that different than compliance with the law generally? I do think they're different, although I will say they somewhat merge. So there is a publicly available auditor report that the same monitor produced to assess compliance with the civil agreement. That is available to the times. So to the extent the argument is they don't have anything here, that is fully available. The criminal case was more sweeping, and the goal of the plea agreement was bolster your compliance systems and establish a more fulsome compliance process. That's what this monitor's report is about. So I think at that point the compliance with the plea agreement and establishing a more thorough compliance system do sort of merge. I will just say one more interest that is in the declarations at the two pages I gave before is also a commercial interest in not letting your compliance systems be circumvented. As I mentioned, some of these are systems that are used to evaluate third-party partners and also are used to constrain employees, and you'll see in both of those declarations. That would seem to me how Volkswagen got into this problem in the first place. I'm sure it had compliance rules, but people circumvented them somehow and got the company into this fix. So I think your point is if you publicize exactly how you're planning to enforce compliance, you're giving people a guidebook on how to evade it. That's exactly right. Both Volkswagen and the government say that in the pages of the declarations I mentioned, and I do think that's a real commercial harm as the $2.8 billion fine that we paid in this case can attest. All right. Thank you, Ms. Ratner. Thank you, Your Honor. Mr. Sumar, you do have two minutes for rebuttal. Thank you, Your Honor. I will be as quick as I can. On a point Ms. Ratner just made about how there is a report here that is available publicly that we can look at and see whether Volkswagen has, in fact, changed its ways, I want to quote exactly what one of those reports said. The monitor's plea agreement reports are not comparable to the ICA's annual reports. The plea agreement reports include a broader evaluation of the effectiveness of the overall compliance program of Volkswagen AG and its subsidiaries and affiliates. There's no comparison. I mean, they can't be otherwise. That would be a justification for releasing the monitor's report if it's already publicly available. Exactly, Your Honor. Another point, the court can, is certainly empowered to do de novo review, and it is not unusual. I would direct you to footnote two in the Grand Central Partnership case where the court says this explicitly, that we have the power to do a camera review, you know, in our discretion. Well, I'm sure we have that power. The question is, should we? Do we need to? And I think this is, yes, Your Honor, for two reasons. One is that if you, again, look at, I mean, we have only the redacted version of the report, but there are certainly sections of factual information here that are on their face, seem to be purely factual, and the only thing that would make them deliberative is this thing that, you know, they've been selectively called. And so certainly on the foreseeable harm analysis, I said there doesn't need to be a line-by-line evaluation, but when it comes to factual information, we do think that's appropriate. The other reason it's appropriate is that this is a document of significance. There's immense public interest here in understanding whether Volkswagen, that cheated the people of the United States, whose conduct has led to hundreds of premature deaths or will in this country, has remediated its program and whether the DOJ was right in its decision to let them out of it. You know, Mr. Sun talked about the presumption of good faith according to government declarations. Yes, but those declarations still have to be logical and plausible, and this court can take into account, you know, as the court did in SAIF when it said, we don't look at this in a vacuum. We look into broader facts in the world. We think that the court can look to, you know, the history and nature of independent monitorships and whether really in those contexts there has been chilling, you know, from release of even just recommendations and observations. On Your Honor's question about would a monitor be chilled, I mean all Mr. Sun had to say were generic statements about this is someone who can, you know, fits into the same role as a government employee. There's nothing specific there. Do we make a factual determination on whether monitors will be chilled? That is what the foreseeable harm provision contemplates is that you have to show, you know, for the specific information withheld that there was a reasonable foreseeing of harm, and I think to some extent that is a factual determination based on the evidence of the declarations, and we don't see that evidence here. On Your Honor's question about, you know, was there a promise of confidentiality here, first of all, again, to the extent we're really concerned about low-level employees, we've conceded that their identities can be withheld. Second, I mean the plea agreement itself says, and this is on 138 of the record, that the DOJ has sole discretion to release this report, and the idea that this was necessarily and always going to remain confidential, the company could dictate that, just isn't true. And third, confidentiality may be important. See, I mean just to put a pin on that point, you're saying because this plea agreement on its face permitted DOJ at its discretion to release some or all of the report, it didn't disincentivize the entry into the agreement, is that? Well, I'm saying that when the company was providing information, they would have known that there was this clause of the plea agreement that said, DOJ can make this public. So, you know, to the extent that there was a promise of confidentiality, it was qualified. But I would also say, you know, confidentiality may be important to Volkswagen because they don't want these facts to come to light. Maybe that's why it was made. But the question here is, does it matter for the monitor? Is it going to undermine the monitor's ability, or future monitor's ability to be candid? You know, on exemption four- So why is the monitor telling us under penalty of perjury that it would? Well, it's not the monitor. It is somebody who worked for the monitor, but- It's also DOJ. It's not just Volkswagen. It's also the Department of Justice that is saying, you know, don't release this. Correct. And they may have their own incentives for, you know, using these monitorships or making it clear to companies that they will fight for confidentiality. But, again, I think there are two questions.  And, again, I think DOJ's declarations, even the counsel for the monitor, they focus on opinions and recommendations. They don't explain how release would undermine a monitor's ability to be candid about factual information. He uncovered- I think that circles us back to the question of just a sort of structural question. Is it within the privilege? We go line by line. You've conceded it's within the privilege. And now you want us to do a line by line foreseeable harm analysis. And I'm not sure the law requires that. And I think you've maybe been ambivalent on that point as we've been talking today. And if I have been, I apologize. And I want to be very clear. On the question of factual information, I do think that that's a line by line review. And not a question about whether it fits within the privilege. It's about meeting the foreseeable harm line by line. Sorry. Just on the question of factual versus deliberative, whether it fits within the exemption. I think that that's a line by line determination. But that is a question about whether the exemption applies, not a question about- Right. Right. But I'm saying that to some extent these two inquiries intersect. And that, you know, Ms. Ratner wanted to point to the summary of key facts at the beginning of the report. That's what they say. And my argument is, okay, but you look at that differently from something like Appendix D, where the monitor is just laying out all of his information, the deliberative material, the recommendations and observations are not even next to it. And I think you have to look at that very differently. I don't think it's enough to say there's some foreseeable harm from release of some portions of this document, and that's determined. You can finish, but we're well over. Yeah. I'll just say on Exemption 4, I mean, JA-166 is all you need to look at. And if the vague sentences there are enough to justify withholding everything covered under Exemption 4, which, you know, V.W. said in a brief, is 90 percent of what's still redacted. I mean, this Court's decision in SIFE and the 2016 amendment mean very little. I'll leave it there. Thank you. Thank you, Mr. Smart. Thank you to all counsel for your briefing and argument. We'll take the matter under advisement.